**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE LAMBERT LAW FIRM PROFESSIONAL CORP.<br>(a Florida professional corporation, 323 Sunny Isles Beach, 700, Sunny Isles Beach FL, 33160);<br>GEORGE LAMBERT<br>(Resident of Florida, 323 Sunny Isles Beach, 700, Sunny Isles Beach FL, 33160, attorney admitted in District of Columbia);<br><br>       Plaintiffs,<br><br>       v.<br><br>CARY HANSEL; aka CARY J. HANSEL, III; aka CARY JOHNSON HANSEL;<br>(resident of Maryland, 2512 N. Charles Street, Baltimore, MD 21218, attorney admitted in District of Columbia)<br><br>HANSEL LAW P.C.;<br>(a Maryland P.C., 2512 N. Charles Street, Baltimore, MD 21218)<br><br>       Defendants. | CIVIL ACTION No.<br><br>**COMPLAINT BASED ON**:<br><br>I.  INTERFERENCE WITH BENEFICIAL BUSINESS RELATIONSHIP;<br>II.  FRAUDULENT CONCEALMENT;<br>III.  FRAUD;<br>IV.  CLAIM FOR INJUNCTIVE RELIEF<br><br>DEMAND OF JURY TRIAL. |

This action is based on the claims of interference of a defendant attorney into the beneficial relationship of a plaintiff attorney and threatening to deprive the plaintiff attorney of the lawful legal fees.  Both the plaintiff attorney and the defendant attorney are admitted in the District of Columbia (although are residents of different States, Florida and Maryland, respectively). Defendant attorney contacted the insurance carrier, that was responsible for the plaintiff attorney's legal fees and threatened to freeze all insurance assets available under the insurance policy, to get immediately $700,000 in inflated and fraudulent invoices. The defendant attorney did those

unlawful or illegal steps without disclosure of the co-counsel, even though he was obligated to disclose to the co-counsel in the legal representation, which amounted to fraudulent concealment. Defendant and, consequently, his law firm undertook numerous acts violating the Rules of Professional Conduct under the applicable law of several jurisdictions, causing damages of a monumental nature to their former clients by their misconduct, negligence, and acting in bad faith. As a result of the defendant's misconduct, the plaintiff and his law firm suffered substantial damages in excess of $75,000.  The conduct of the defendant's attorney is under the jurisdiction of the regulations of the District of Columbia Bar.

### I. PARTIES.

1.     Plaintiff. THE LAMBERT LAW FIRM PROFESSIONAL CORPORATION (hereinafter also "LAMBERT LAW FIRM") is a Florida professional corporation with an office at 323 Sunny Isles Beach Blvd., Ste 700, Sunny Isles Beach, FL 33160.  The second plaintiff is the principal attorney in that law firm.  LAMBERT LAW FIRM is a plaintiff in this lawsuit because it has suffered substantial material damages, being deprived of the income approved and committed by its clients, payable from the insurance carrier proceeds, under the lawful D & O Insurance Policy.

2.     Plaintiff GEORGE LAMBERT (hereinafter also "LAMBERT") is an attorney admitted in the District of Columbia, Florida, and Massachusetts.  Lambert's 1025 Connecticut Ave., 1000 NW, Washington, D.C., 20036; 100 Cambridge Str., 14th Fl., Boston, MA 02114, and 323 Sunny Isles Blvd, Ste 700, Sunny Isles Beach, FL 33160.  Lambert's residential address is in Florida, and his main office address is at 323 Sunny Isles Blvd, Ste 700, Sunny Isles Beach, FL 33160.

3.      Defendant CARY HANSEL, aka CARY J. HANSEL, III, aka CARY JOHNSON HANSEL, is an individual whose address is c/o Hansel Law P.C., 2512 N. Charles Street, Baltimore, MD 21218.  Hansel is an attorney licensed in Maryland and the District of Columbia. The office address in the District of Columbia is unknown, though required in this jurisdiction.

4.      Defendant HANSEL LAW P.C. is a Maryland professional corporation registered on March 23, 2015, at the above address: 2512 N. Charles Street, Baltimore, MD 21218. The corporation's articles of incorporation state that it is authorized to issue $100 stock par value.

**JURISDICTION.**

5.      This Court has jurisdiction over the Defendants based on the diversity of citizenship prong, where the claim amount is over $75,000.  Namely, the Plaintiffs are the residents of the State of Florida, and the Defendants are the residents of the State of Maryland.  There is a complete diversity of citizenship in compliance with 28 U.S. Code § 1332.  The venue is proper because both attorneys are licensed in the District of Columbia and are governed by the same Rules of Professional Conduct.  The damages caused by the Defendants occurred, among other places, in the District of Columbia, where the Plaintiffs' legal services are provided.

**FACTS COMMON TO ALL COUNTS.**

6.      On or about May 15, 2019, the SEC filed a lawsuit in the U.S. District Court for the Southern District of New York, captioned *U.S. Securities and Exchange Commission v. Collector's Coffee. Mykalai Kontilai, et al*., Docket 19-cv-04355.

7.      Lambert was engaged by his prospective Client, Mykalai Kontilai, in August 2020. Since then, Lambert has been Kontilai's attorney of record, with the exception of the period from April 2023 to July 2024, returning back to being Kontilai's civil counsel, in addition to his criminal defense counsel.

8.      Since May 2023, Lambert has also been Kontilai's defense attorney in the criminal case United States v. Mykalai Kontilai in the U.S. District Court for the District of Nevada, case 20cr109. Lambert was admitted pro hac vice under the sponsorship of a Nevada attorney.

9.      Since August 2023, Lambert has also been Kontilai's defense attorney in the second criminal case, *United States v. Mykalai Kontilai*, in the U.S. District Court for the District of Colorado, case 20cr083, acting as an attorney admitted to practice in that District Court.

10.     By way of context, Lambert is admitted in six U.S. District Courts and eight U.S. Courts of Appeals.  Lambert's disciplinary record is clean in all three Bar Associations in the jurisdictions where he is admitted (District of Columbia, Florida, and Massachusetts).

11.     Since October 2023, Lambert has also been an attorney of record for defendant Collector's Coffee Inc., in the above case, *U.S. Securities and Exchange Commission v. Collector's Coffee Inc., Mykalai Kontilai et al.*, 19cv4355.  Lambert holds the informed waiver of conflict of interest between him and the clients he represents in that case.  Several attorneys have represented the same defendants in that action at different times.

12.     In May 2021, Kontilai and Hansel exchanged telephone calls regarding a prospective representation of Kontilai in the case *U.S. Securities and Exchange Commission v. Collector's Coffee Inc., Mykalai Kontilai*, case 19cv4355, in the U.S. District Court for the Southern District of New York.

13.     As discovered later, during negotiations for engaging the said attorney, Hansel did not disclose that he maintained an extensive portfolio of more or less 50-60 cases at any given time. At the same time, Hansel used small paralegal support without experienced attorneys, at least at the time. Hansel did not disclose that he had little time for a case of that size.

14.     As part of unfortunate deceptive tactics, Hansel told Kontilai that he had represented a former Assistant Inspector General of the SEC and could bring him in as an attorney or an expert witness but would not provide his direct number. Subsequently, Hansel was silenced and did not deliver on that promise.

15.     On May 31, 2021, Kontilai and Hansel executed a retainer agreement, and Hansel entered an appearance in the above case in parallel with Lambert, who had been doing discovery work, taking a number of depositions, and being highly active and diligent in representing Kontilai.

16.     Shortly after his appearance in the case, though, Hansel refused on multiple crucial occasions to implement Kontilai's instructions after his appearance in the case and consistently underperformed.

17.     When Hansel appeared in the case, there were minimal activities after discovery had already been completed, and the remaining portion of the litigation was occasional motion practice and trial. However, with that limited scope of the work, Hansel did not deliver conscientious, diligent work.

18.     For example, the client asked Hansel to obtain a carve-out and procure a maintenance order, excepting from the Temporary Restraining Order, for Kontilai. Hansel's role was to obtain a carve-out in the temporary restraining order, which did not allow Kontilai to eat, clothe himself, or receive medical treatment.

19.     However, Hansel delayed resolving the maintenance issues for many months until November 2023.  At the hearing itself, in November 2023, Hansel was poorly prepared.  Hansel did not call any witnesses on Kontilai's behalf, only an expert in forensic accounting, despite Kontilai insisting that Hansel do so.  While doing so, Hansel disobeyed the client's instructions to call factual witnesses.

20.     As a result of that hearing without essential witnesses to testify in favor of Kontilai, the Court entered an exorbitant Preliminary Protective Order for about $46 million, an extraordinary amount that was at least twice all revenues from investments that Collector's Coffee obtained at any time.  The subsequent Preliminary Injunction ruling noted that he did not rule in favor of Kontilai because Hansel did not call any factual witnesses in his defense.

21.     on numerous occasions in its Orders, the Court noted that he was highly dissatisfied with Hansel's performance, who repeatedly brought the same issues up to five times, wasting the Court's time.

22.     In April 2023, Lambert temporarily withdrew from representing Kontilai in the SEC case, focusing on Kontilai's two other cases related to the Client's extradition proceedings from Germany.

23.     In June 2023, the Court, in the *SEC v. Collector's Coffee Inc., Mykalai Kontilai,* ordered the jury trial to commence on October 3, 2023.

24.     A notation is made that the client, Kontilai, expressly consented to Lambert's allegations, made below, when those could possibly be subject to attorney-client privilege. For any such instances, if any, Kontilai has provided Lambert a waiver of privilege.  That being said, Lambert believes that no attorney-client privilege applies to any of the following factual allegations.

25.     Shortly after the Order concerning the jury trial in October, Hansel, after representing Kontilai for 2 (years) in that action and obtaining legal fees of over $1 million merely on his scarce motion practice after discovery, suddenly—and shockingly—declared to Kontilai that he intended to file a motion to withdraw.

26.     Namely, Hansel explained his threatened Motion to withdraw shortly before the trial that he was very busy with other cases until the end of 2023 and had no time to prepare for the trial in October 2023.

27.     Kontilai vehemently objected to Hansel's threat of withdrawing from the case and abandoning the client a few months before the jury trial.  The circumstances were such that Hansel was the only attorney of record for Kontilai at that time, and it was his contracted retainer to prepare for trial and conduct the trial.  At all times, Hansel held himself as a trial attorney, and his main mission was litigation.

28.     In response to Kontilai's protestation that Hansel was unfairly abandoning, in bad faith, and essentially betraying his client, on July 25, 2023, Hansel sent Kontilai an unspeakable demand to sign a statement of releasing any claims against Hansel and his firm for future inadequate preparation for trial.  Given Hansel's proposed ultimatum-style draft, Kontilai felt that Hansel betrayed him and the fiduciary obligation to defend him at the most critical juncture in the litigation, the jury trial.

29.     In particular, Hansel's mandatory or extortionist release, in violation of Model Rules of Rule 1.8, stated as follows: "*In consideration for this general release of all past, present and future claims set forth in the above-numbered paragraphs, the Releasees agree to forebear from filing a motion to withdraw as a result of the scheduling of your October 3, 2023, trial.*"

30.     The purported "Release" of an extortionist nature went on to state: "*You and all Releasors agree and represent that no claims of any type or description against any Releasees, whether now existing or arising in the future, may ever be brought as all are forever waived and discharged hereunder. This is intended to be a general release of all past, present, and future claims, whether or not they arise from the concerns raised in this letter. You and all Releasors*

7

*explicitly acknowledge that the waivers and releases reflected herein are full and complete and encompass any claims that may arise in the future and include all acts, failures to act or other facts giving rise to any claims which may occur in the future.*"

31.     Such a purported agreement violated Rule 1.8 of the Model Rules of Professional Conduct and, as such, was invalid, voidable, void, or ineffective.

32.     Kontilai consulted with his other counsel, who opined that these demands to release from claims of malpractice were made under duress, threatening that Kontilai would be left without representation at the trial at all, doomed to lose, possibly on default, as no attorney would endeavor to get to speed at such a short period in a big case as that one, for which Hansel supposedly had over two years.

33.     However, Hansel promptly acted in breach of his commitment to go to trial on October 3, 2023, as the Court prescribed, and overruled his promises by claiming additional extensions in the Court.  Based on information and belief, the claim for extensions was driven by Hansel's financial agenda, which was to pursue a bill for more months of purported work on the case.

34.     In August 2023, Hansel represented to the Court and other attorneys that he was overbooked with other cases until the end of the year and could not do the trial work in the present case. The Court did not take this well, which affected Kontilai because the Court concluded that Hansel's statements and arguments had no merit.

35.     On August 18, 2023, the Court's Status Conference was held, which Hansel and Lambert attended.  Without asking permission from the client, Hansel declared to the Court that he had a conflict with his busy trial schedule.  Following the parties' explanation of their views on the currently scheduled trial date of October 3, the Court had to direct the parties to confer and

identify mutually available times beginning in mid-November for trial." Hansel's lengthy oral presentations, which were self-serving and damaging to Kontilai, caused the Court to delay the trial.

36.     Hansel caused the Court, multiple staff members, and other attorneys to change their schedules to attend the trial on December 5, 2023.

37.     On October 24, 2023, Hansel's junior associate, Ashton Zylstra ("Zylstra"), filed a Motion to appear in the case Pro Hac Vice for that major trial, Dkt 1321, in the SEC's case in New York. The supporting documents, showing she was starting to practice law, raised doubts about whether she qualified to enter appearance seven weeks before the trial.

38.     The Court did not approve Zylstra's Motion until November 6, 2023, Dkt 1372, less than a month before the trial.

39.     After appearing in the action before the trial, Zylstra became personally responsible as an attorney for all shortcomings of her co-counsel Hansel. With Hansel's encouragement and protection, Zylstra got involved in the federal court trial for material gain, charging an extraordinary hourly rate as a young attorney going into her first federal trial in her career without any trial work experience in federal courts.

40.     Zylstra appeared in the action without Kontilai's consent and without asking his consent; he was merely not authorized by Kontila. Hansel, likewise, did not ask Kontilai for consent to be permitted to be represented by Zylstra.

41.     On numerous occasions, Kontilai instructed Hansel to call at the trial the concrete witnesses on his behalf, stating in writing: "*Please send the following subpoenas to the following witnesses. As soon as possible to the following people. Here is my list.*" (25 names on the witnesses list).

42.     Kontilai's requests to follow his instructions were sent to Hansel: "*You have not issued trial subpoenas nor responded to my important email on preparing an interlocutory appeal on the PI Asset Freeze, which will be forthcoming.*"  "*I need to speak to you ASAP.*" "*Here is the list of items you agreed to send me yesterday.*"  However, Hansel mainly remained unresponsive and unapologetic.

43.     Demonstratively, Hansel kept filing without Kontilai's express approval and did not even send a draft for Kontilai's review.  The emergency letters from Kontilai showed frustration with Hansel's conduct: "*I need to speak to you asap.  I have been left totally in the dark from you…*" "*You are filing things without my even knowing the issue or rendering an opinion….*"  "*As a client, I have the right to review all filings before they are filed and approve all before it's filed.*" "*We need to speak at least 1 time a week moving forward.*"

44.     Contrary to the client's instructions, Kontilai, Hansel did not call at the trial the witnesses who would benefit his defense.  Nor did Hansel their presence at the trial.  That had a fundamental negative impact on the defense in that trial.

45.     Hansel attended the trial from December 5 to 13, 2023, but was sufficiently ineffective to result in a negative jury vote on the Special Verdict.  Lambert represented Collector's Coffee Inc. at that trial.

46.     Hansel did not get prepared for the trial.  Markedly, instead of relying on electronic documentation prepared in advance, Hansel was the only one who used paper documents, saying he was a "paper man."

47.     Hansel did not use electronic evidence on the screen to show to the jury at the trial. Hansel was essentially the attorney at the trial who failed to use electronic evidence on the screen before the jury, even in the closing presentation.

48.    On her part, Hansel's junior associate Zylstra, without a federal trial experience, who was supposedly responsible for technical support without any paralegal present, failed to prepare slides or other visual materials to demonstrate to the jury.

49.    During the trial, Hansel's junior associate Zylstra made random objections, which Hansel whispered to her, trying to justify her mere presence at the trial.

50.    Upon Hansel's poor performance at the trial, the verdict was adverse for Kontilai. The conference with the jury of the attorneys for all parties and the judge's law clerks revealed that one reason was that Hansel was short on electronic visual materials.  That failure was the direct fault of both Hansel and Zylstra, neither of whom prepared visual materials for the trial.

51.    After the trial was completed on December 13, 2023, the case had very little activity for about eight months.

52.    on information and belief, Hansel was active in an appellate matter but never presented to Kontilai the copies of what he was filing in the 2nd Circuit, U.S. Court of Appeals. On information and belief, nearly all submissions by Hansel in the U.S. Court of Appeals were either dismissed as premature or were unsuccessful.  Hansel did not send advance drafts to Kontilai or Lambert, keeping them in the dark about his filings.

53.    In May 2024, in conjunction with the insurance specialist attorney, Kontilai proposed to Lambert to work on a flat fee, which would allocate the remaining insurance proceeds for the next about three years of work without hours.

54.    The negotiated flat fee arrangement covered Lambert's criminal defense work in criminal cases in the Districts of Nevada and Colorado, including the appeals in the 9th Circuit and the 6th Circuit of the U.S. Courts of Appeals.  That flat fee arrangement also covered the remaining civil case, *SEC v. Collector's Coffee, Mykalai Kontilai*, in the U.S. District Court for the Southern

District of New York, including the appeal in the 2nd Circuit of the U.S. Courts of Appeals.    The reason was that the balance left on the allocated insurance assets was dwindling, and several months could be covered under the D & O insurance policy, preventing the termination of legal work if it is conducted at hourly rates.

55.    Based on information and belief, Hansel somehow learned of the flat fee arrangement with Lambert in the works.

56.    On about July 2, 2024, Hansel sent his purported invoice to the insurance carrier and then approached Kontilai by telephone. All of a sudden, Hansel presented invoices for many months for over $700,000 for purported work and expenses starting from May 2023. The invoices were strange or fraudulent, going back **14 months earlier**.

57.    Hansel's and Hansel Law's invoices were highly questionable, apparently fraudulent, or suspect on many issues, being extraordinarily inflated given the very little work that Hansel demonstrated.   Among other things, Hansel demonstrated unpreparedness and poor performance at the jury trial, at which time he failed in his obligations to be diligent before the Client. Given the unusual practice of Hansel, handling about 50-60 cases simultaneously, such billing would be impossible even mathematically under the 24-hour-a-day principles.

58.    According to Hansel's admission to Kontilai, he routinely handles 50-60 cases simultaneously, and he is the only trial attorney at his law firm, which is mandatory for handling trials on behalf of Hansel Law P.C.

59.    Hansel demanded prompt payment despite waiting 14 months to send his invoice. In a subsequent exchange of documents, Hansel admitted that he had been recording the conversations without Kontilai's consent. Kontilai was in Nevada at that time. Hansel admitted to doing so in an email to Kontilai's insurance counsel, David Feldman, who has an office in Nevada.

60.     Those phone calls that Hansel allegedly recorded were on the secure telephone line connecting attorneys to the detention center in Nevada and were not recorded. Each telephone conversation that attorneys made to that detention center in Nevada expressly stated that the conversation was privileged and unrecorded.

61.     Despite knowing that the detention center did not record his conversation with the Client, Hansel, as the evidence shows, recorded those on his volution.  Hansel impressed the client, Kontilai, that he must authorize an immediate payment from the insurance proceeds of over $700,000 to Hansel and his law firm, or Hansel would withdraw from the case, in the same scenario as Hansel did before the jury trial.

62.     Hansel declared that over $300,000 in additional legal fees were to be paid, the total exceeding $1 million, which must be paid nearly immediately.

63.     Kontilai was shocked and initially refused to approve Hansel's claims, stating that they were fraudulent after the fact and that the funds were allocated primarily to the criminal defense work, which was at its intensive pre-trial stage.

64.     Hansel intensified his phone calls to the detention center, demanding to speak to Kontilai, even when Kontilai was sometimes at the doctor's appointments.

65.     In writing to the insurance attorney, Hansel threatened to immediately withdraw from representing Kontilai.  Under the circumstances, Kontilai assumed that Hansel intended to file a hostile motion to withdraw, putting Kontilai in a bad light.

66.     On July 18, 2024, Kontilai voluntarily executed a consent to Hansel's withdrawal from the SEC case in the U.S. District Court for the Southern District of New York, with a proposed draft Consent Motion to withdraw from representation.

67.     Kontilai appointed Lambert to replace Hansel in the SEC civil case in New York. On July 23, 2024, per Kontilai's request, Lambert filed a motion for an appearance in the civil case of the SEC on behalf of Kontilai, which was granted by the Court the next day.

68.     At that point, Hansel dropped his threat to withdraw from the case without any excuse but stayed in it anyway.

69.     When Hansel actually reached Kontilai on the phone, he changed tactics, denying that he threatened to withdraw immediately. Instead, Hansel threatened to freeze all of the insurance proceeds still available to Kontilai's defense, particularly attacking the allocation of the funds for his criminal defense.

70.     In unspeakable misconduct, Hansel threatened Kontilai with freezing all his insurance proceeds and filing a lien, even beyond his claim for payment of the legal fees. Given Hansel's coercion and blackmail, Kontilai was indeed scared and promised to pay some funds.

71.     For example, on August 6, 2024, Hansel sent a letter to Kontilai by FedEx through a detention center, not marking it as under attorney-client privilege. In it, he made threats of withdrawal and proposals. Hansel indicated he copied the insurance carrier.

72.     In that letter, Hansel threatened Kontilai with "collection efforts" even when his invoices were recent, submitted less than a month earlier, and triggered numerous concerns and questions. Markedly, under the insurance carrier's guidelines, even if accepted as legitimate, payment was not required until 60 days after the presentment of an invoice.

73.     Hansel wrote: "*Rather than risk our collection efforts interfering with future insurance payments, I would urge you to please reach out to us to negotiate a speedy and fair resolution…*"

74.     Hansel also wrote several times about "collection efforts in the same letter," *e.g.,* *"avoiding having to engage in collection activities with former clients"*…  Then Hansel again proposed or rather imposed his legal services on Kontilai, even after the termination letter from Kontilai, in which Kontilai wrote that Hansel had betrayed him as an attorney.

75.     When Hansel wrote about "*interfering with future insurance payments,*" he consequently attacked Lambert and his law firm. Lambert and his law firm were awaiting the flat fee from the insurance carrier. Hansel's threats meant that Hansel was impeding the assets tentatively allocated for Lambert and his law firm.

76.     On the next occasion, on August 9, 2024, Hansel wrote on his letterhead to the insurance carrier's attorney in New York, without copying Lambert, the following: "*The Insurer's refusal to honor our invoice without first requiring any substantial objection to anything therein while paying other bills for services more recently rendered (or to be rendered in the future) is an inducement to breach the legal services contract between Hansel Law and Mr. Kontilai.*"

77.     Kontilai's statements were untrue because four days before, Kontilai sent Hansel a Termination Letter in which Kontilai stated Hansel was not authorized to represent him for any purpose and had a duty finally to withdraw.  Kontilai was no longer Hansel's client.

78.     In another paragraph, Hansel threatened: "*If we are unable to reach agreement (sic) on either point within the next **72 hours**, we will seek judicial intervention, including injunctive relief **to freeze any and all future policy payments** until this issue is resolved our invoice is paid in full*" (meaning Hansel demanding to yield to the $700,000 unlawful demand within three calendar days).  Additionally, Hansel orally indicated to Kontilai over the phone that a demand for an additional $300,000 was forthcoming, without disclosing for what.

79.     Notably, under the insurance carrier's guidelines, it had 60 days to investigate any invoice and no obligation to pay until the expiration of those 60 days.

80.     In sum, Hansel demanded that he be paid about $1 million. If not, he will freeze about $2 million remaining under the insurance policy, causing immediate and devastating harm to Kontilai, whose representation in the criminal cases was under Hansel's attack.

81.     Hansel calculated his attack before the criminal trial in November 2024, when a disruption of the legal fees of the criminal defense attorneys would leave Kontilai helpless in the November trial.

82.     If proven at the jury trial, Hansel's misconduct fell under the prohibitions of 18 U.S. Code § 875 'Interstate communications': *"(d) Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both."*

83.     Such misconduct would also fall under the prohibitions of the State Law of Nevada, where Kontilai was at the time Hansel made his threats to deprive him of the criminal defense funds, punishable under the statute  NRS § 205.320 "Threats" (stated as: "*category B felony and shall be punished by imprisonment in the state prison for a minimum term of not less than 1 year and a maximum term of not more than 10 years, or by a fine of not more than $10,000, or by both fine and imprisonment. In addition to any other penalty, the court shall order the person to pay restitution*."

84.     Hansel thus indirectly attacked Lambert and his law firm, which awaited a beneficial flat fee arrangement with the insurance carrier.  However, Hansel interfered with the beneficial contractual arrangement, delaying and obstructing such an agreement to be finalized.

85.     Hansel also attacked his former client, Kontilai, who was to suffer the consequences of the unpaid legal fees for his criminal defense. Kontilai would then be doomed to represent himself at trial scheduled for November 2024 pro se or use a public defender instead of attorneys of his choice.

86.     At the time when Kontilai, according to two indictments, faced potentially a life sentence in a write collar prosecution, Hansel's threats meant a lethal threat to Kontilai.

87.     Under these circumstances, Hansel coerced to sign a "settlement" that authorized to pay Hansel immediately $500,000 and allowed Hansel to continue be working for Kontilai, albeit in a new capacity of his human rights lawyer, for which Kontilai would prefer to have another attorney, locally available in Las Vegas, Nevada, where the first trial was to take place.

88.     Based on information and belief, on the occasions when Hansel called Kontilai on the phone in the detention center, Hansel illegally recorded his conversations with Kontilai to record purported "admissions" to pay and put Kontilai in a problematic situation.

89.     For example, on July 11, 2024 (at 8:54 AM), Hansel wrote by email to three other parties, each being an attorney: "*Mr. Kontilai **has told me on multiple recorded calls since that he gave no such direction*" (not to pay upon Hansel's demands to pay*).

90.     Later, Hansel attempted to withdraw his admission of taping the conversation with the then-client, Kontilai, alleging that he meant the detention center was recording the conversations.  However, such a late retraction was against the common interpretation of the

blackmail contents of Hansel's email communication, which meant that he, Hansel, recorded Kontilai to prove that he did not direct the insurance carrier not to pay Hansel $700,000.

91.     Hansel's later attempted retraction of his admission was contrary to the fact that all conversations between attorneys and clients, coming to or going from the detention center, are not recorded as a matter of federal and State law, punishing any attempts to record privileged conversations as felonies.

92.     Hansel knew that Kontilai had entered any phone calls with Hansel as subject to attorney-client privilege, and those could not be recorded at the detention center as a matter of strict application of the law.   Consequently, both the menacing meaning of Hansel's letter, demanding to pay money immediately, and the fact he was aware of the confidentiality of his telephone calls with Kontilai left no doubt that Hansel admitted to recording his client for tortious intent.

93.     The statutes of Maryland, where Hansel initiated the calls, and Nevada, where Kontilai was situated, prohibited recording telephone conversations.

94.     Hansel's alleged recording of his conversations with his client, Kontilai, was not unethical but illegal.

95.     Namely, under MD Section §10–402. *"(a) ... it is unlawful for any person to (1) Willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication…"*

96.     All subsequent citations of the Rules of Professional Conduct refer to the Model Rules of Professional Conduct (MRPC) adopted by the American Bar Association and substantially restated with minor variations in different States when Hansel represented Kontilai.

97.    Hansel acted, on information and belief, in violation of Rule 8.4, 'Misconduct,' without limitation.  That violation, described above, is deemed to be a felony. To quote from the same Section: "*(b) Any person who violates subsection (a) of this section is guilty of a felony and is subject to imprisonment for not more than 5 years or a fine of not more than $10,000, or both*."

98.    Wiretapping is a federal offense under certain circumstances as well.  Under federal law, a party to a phone call is permitted to record it without anyone else's consent. However, if that is done for tortious purposes, it is illegal.  Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Pub. L. 90-351; 6/19/68), also known as the "Wiretap Act," prohibits the unauthorized, nonconsensual interception of "wire, oral, or electronic communications."

99.    On information and belief, Hansel acted in violation of 18 U.S. Code §2511 'Interception and disclosure of wire, oral, or electronic communications prohibited': *(1) Except as otherwise explicitly provided in this chapter, any person who—(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; (b)intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication...*"

100.    The penalty for violating federal wiretapping laws is up to five (5) years in prison and $250,000 in fines. The victim can also sue the recorder and recover punitive damages and attorney's fees.

101.    Nevada state law also prohibits recording without consent and is stricter than federal law under NRS 200.620.

102.     Violating NRS 200.620 is a category D felony. The sentence for a category D felony includes one to four years in Nevada State Prison and a possible fine of up to $5,000.  In addition, Nevada law says that you are civilly liable to anyone you wiretapped without permission.

103.     A Las Vegas District Court could award the "damaged" party with actual damages or liquidated damages of $100 per day of violation but not less than $1,000 (whichever is greater), punitive damages, and a reasonable attorney's fee.

104.     Besides the laws of the United States, MD, and Nevada (the "consent" States), Hansel's alleged misconduct violated the fiduciary obligations required under the Rules of Professional Conduct regulating the attorney's conduct toward clients.  As such, it is an unspeakable misconduct of an attorney to record his client without his permission.

105.     Once learning of that allegation and documentary evidence, Lambert was utterly shocked by Hansel's alleged misconduct.  As an attorney, Lambert completely dissociates myself from Hansel's alleged misconduct, including the alleged recording of the client for extortionist tactics.  Lambert finds such misconduct reprehensible, morally, ethically, and legally unacceptable for the legal profession.

106.     Lambert further believes such misconduct is dangerous for the licensed profession. If such misconduct is not addressed, clients will not trust their attorneys or use such legal services, and clients will be afraid that an attorney will record conversations with them, including their confidences, without consent.

107.     Once Lambert learned of Hansel allegedly recording conversations without consent for extortionist purposes, he refused to communicate with Hansel by telephone, suspecting that Hansel would record any conversation with him.

108.    Lambert also learned in August 2024 that Hansel plotted before the insurance carrier to undermine Lambert's flat fee contract in the making.

109.    Namely, in at least two letters to the insurance carrier's counsel, Hansel threatened that unless he is immediately paid $700,000 within 72 hours, he will obtain a freeze of all insurance proceeds assets still available to Kantilai.

110.    By making threats to the insurance carrier and demanding the funds tentatively allocated for Lambert's flat fee arrangement, Hansel indirectly attacked Lambert, depriving him of the legal fees tentatively allocated to him before.

111.    When Hansel made such written threats to the insurance carrier, he did not copy Lambert, which he was obligated to do under the basic ethical norms.  Hansel's moves amounted to fraudulent concealment because he was obligated to copy Lambert and Kontilai, which he failed to do.

112.    Carefully considering all evidence, Lambert concluded, as an attorney and officer of the court, that he was under the duty to report Hansel's misconduct to the competent Bar authorities under the Model Rules of Professional Conduct, Rule 8.3: 'Reporting Professional Misconduct,' that reads in the relevant part as follows: "*(a) A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority*."

113.    On August 12, 2024, fulfilling his professional duty under Rule 8.3, Lambert reported Hansel to the District of Columbia Bar Association and the State of Maryland Bar Association.

114.    The Disciplinary Commissions of both Bar Associations nearly immediately accepted and opened preliminary disciplinary matters concerning Hansel.

**COUNT I. INTERFERENCE WITH BENEFICIAL BUSINESS RELATIONSHIP.**
**(Stated against Defendants Cary Hansel and Hansel Law)**

115.    Plaintiffs incorporate the allegations in Para 1-114 by reference and further allege as follows.

116.    As stated above, the Plaintiff learned, from Hansel's written correspondence with a third party, that he had been recording the conversations with Kontilai. In context, Hansel wrote that in a letter demanding payment of his legal fees and used that veiled statement to create pressure or extort money to be paid immediately (72 hours).

117.    As cited above, in a representative letter on August 6, the day after Kontilia terminated him, Hansel threatened Kontilai with "collection efforts" even though his invoices were recent, submitted less than a month earlier, and triggered numerous concerns and questions.

118.    Hansel wrote: "*Rather than risk our collection efforts **interfering with future insurance payments**, I would urge you to please reach out to us to negotiate a speedy and fair resolution…*"  Then Hansel wrote several times about "collection efforts," e.g., "*avoiding having to engage in collection activities with former clients*"…  Then Hansel again proposed his legal services, even after the termination letter from Kontilai, in which Kontilai wrote that Hansel had betrayed him as an attorney.

119.    When Hansel wrote about "interfering with future insurance payments," he attacked Lambert and his law firm. Lambert and his law firm were awaiting the flat fee from the insurance carrier. Hansel's threats meant that Hansel was impeding the assets tentatively allocated for Lambert and his law firm.

120.    On the next occasion, on August 9, 2024, Hansel wrote on his letterhead to the insurance carrier's attorney in New York the following: "*The Insurer's refusal to honor our invoice without first requiring any substantive objection to anything therein while paying other bills for services more recently rendered (or to be rendered in the future) is an inducement to breach the legal services contract between Hansel Law and Mr. Kontilai.*"  Hansel's contentions were untrue because Kontilai sent Hansel a Termination Letter four days before. Kontilai stated Hansel was not authorized to represent him for any purpose and had a duty finally to withdraw.  Kontilai was no longer Hansel's client.

121.    In another paragraph, Hansel threatened: "If we are unable to reach an agreement on either point within the **next 72 hours**, we will seek judicial intervention, including injunctive relief, to freeze **any and all future policy payments** until this issue is resolved and our invoice is paid in full."

122.    Hansel thus attacked Lambert and his law firm, which stood to obtain a beneficial flat fee arrangement with the insurance carrier, by interfering with the beneficial contractual arrangement.

123.    Hansel, threatening to freeze the insurance proceeds allocated to Lambert's and his law firm's flat fee arrangement to bring the defense work and appeals until the conclusion in Kontilai's cases, caused Lambert damages in the hundreds of thousands of dollars.

124.    Starting on February 1, 2024, the insurance carrier unreasonably delayed Lambert's payment of his regular legal fees in light of Hansel's attacks on the insurance carrier, Kontilai, and, indirectly, Lambert, as described above.

125.    As mentioned above, Hansel's misconduct was in violation of several professional obligations and regulations.  The alleged recording of conversations without the consent of the

other party to the conversations is prohibited in Model Rules of Professional Conduct 8.4, to wit: "It is professional misconduct for a lawyer to: …"(*b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation*;"

126.    On information and belief, Hansel indicated on the alleged recording of the client's conversations that unless he received $700,00, Hansel would interfere with Lambert's work when Lambert worked as Kontilai's defense work in the criminal cases.  Hansel's alleged recording of the conversations represented a fundamental breach of fiduciary obligations and was unspeakable for the legal profession, contrary to the dignity of an attorney's status.  If any attorney were recording the client's confidential information, that would eventually mean the symbolic death of the legal profession, as no client would entrust any confidential information to an attorney.

127.    Accordingly, Hansel illegally interfered with Lambert's beneficial business relationship with Kontilai and the insurance carrier, under which he was scheduled to be paid.

128.    As a part of the claim, the Plaintiffs seek discovery of the accounting of the hours that Hansel spent on each of his 50-60 cases, where he litigated simultaneously, with a reasonable projection that Hansel's billing of the hours allegedly spent on representing Kontilai was impossible given the multiple other cases and trials he developed on his calendar.

129.    When Hansel demanded that about $1 million be urgently paid before due under the insurance carrier's Guidelines required payment or response within 60 days (meaning September 2, 2024), Hansel threatened to freeze the entire balance of about $2 million remaining under the insurance policy.  That directly damaged Lambert and the Lambert Law Firm.

130.     In addition to the interference with the plaintiffs' beneficial relationship with Kontilai and the insurance carrier, Hansel's misconduct fell under the federal and State statutes prohibitions.

131.     The plaintiffs state that the claim was based on Hansel's interference with their beneficial business relationship with his client and the insurance carrier. The Plaintiffs' damages, which could be hundreds of thousands of dollars, are to be determined at the jury trial.

### COUNT II.  FRAUDULENT CONCEALMENT.
### (Stated against Defendant Cary Hansel).

132.     Plaintiffs incorporate by reference allegations in Para 1-114 and allege as follows.

133.     Hansel's misconduct satisfied the elements of a claim based on fraudulent concealment when the defendant concealed or suppressed a material fact;  had knowledge of this material fact that this material fact was not within reasonably diligent attention, observation, and judgment of the plaintiff;  the defendant suppressed or concealed this fact with the intention that the plaintiffs be misled as to the true facts about the assets; the plaintiffs were reasonably so misled; and the plaintiffs suffered damages as a result.

134.     As mentioned above, when Hansel wrote to the insurance carrier on August 8, 2024, that he was about to freeze the insurance proceeds, Hansel did not copy Lambert, acting fraudulently.  Under the basics of ethics and several of the Model Rules of Professional Conduct, Hansel was obligated to copy the former co-counsel representing the same client and affecting the new counsel's interests.

135.     Namely, acting covertly, Hansel pursued his agenda of extorting money under the color of right, not even due under the Guidelines of the insurance carrier, even if Hansel's invoices were accepted, which were not.

136.    Because Hansel acted fraudulently and concealed the correspondence from Lambert, who had no access to it, Lambert learned that Hansel was attacking the Plaintiffs' interests and could not promptly take preventive measures.

137.    Plaintiffs are entitled to damages for Hansel's fraudulent concealment to the full extent allowed by the law.

**COUNT III. FRAUD.**
**(Stated against Defendants Cary Hansel).**

138.    Plaintiffs reference the allegations in Para 1-114 above and further allege as follows.

139.    Hansel's misconduct also satisfied the elements of the claim for damages for the defendants' fraud, which included a fraudulent misrepresentation in such form as to be a statement of fact; the fact misrepresented must be relevant and material; the representation was untrue, and Hansel making the representation must know or believe it to be untrue, and to make it with a reckless disregard for its truthfulness or falsity, and the representation must be made to influence the insurance carrier, act in its official capacity, the insurance carrier to which such representation was made must believe and rely on the accuracy of the information provided and have the right to do so.

140.    Hansel also committed fraud when he plotted and acted to deprive Lambert of the tentatively allocated fees for the flat agreement arrangement for the remaining stages of 3 cases in the U.S. District Courts and the related appeals.

141.    Kontilai is entitled to relief against Hansel and recover damages against Hansel based on a fraud that Hansel allegedly committed.

**COUNT IV. CLAIM FOR INJUNCTIVE RELIEF.**
**(Stated against All Defendants).**

142.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 114 and further allege as follows.

143.    Hansel's misconduct warrants to seek injunctive relief against him and his law firm. An injunction can be granted, subject to conditions imposed by applicable statutes, on a showing of the following: An inadequate remedy at law, meaning that compensation would be insufficient; A serious risk of irreparable harm absent injunctive relief; A likelihood that the plaintiff will prevail on the merits of the underlying controversy; A comparison of the harm to defendant in issuing an injunction versus the harm to plaintiff in withholding it, which on balance favors the plaintiff.

144.    As mentioned above, Hansel circumvented Lambert's interests by using threats, blackmail, and duress to influence Kontilai to yield to his demand. That occurred when Hansel admitted, albeit veiled and with intent to affect Kontila, that he had been recording telephone conversations with Kontilai without his consent, pursuing material gain. Under the totality of the circumstances, Hansel implied that he would use the recordings before third parties.

145.    Plaintiffs will be irreparably injured unless Injunctive Relief is granted during this action. Namely, Hansel should be forbidden by a court order to coerce and threaten anyone or circumvent Lambert and his law firm's interests.

146.    Hansel launched his extortionist attack when the insurance carrier's payment was not even due. Under the carrier's guidelines, it had 60 days to investigate any invoice and was not obligated to pay until the expiration of those 60 days.

147.    As mentioned above, Hansel demanded that he be paid about $1 million, and if not, he would freeze the about $2 million remaining under the insurance policy, causing immediate and devastating harm to Kontilai, whose representation in the criminal cases was under Hansel's attack.

148.    If proven at the jury trial, Hansel's misconduct fell under the prohibitions of 18 U.S. Code § 875 'Interstate communications': "(d) *Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both*."

149.    As also mentioned above, such misconduct would also fall under the prohibitions of the State Law of Nevada, where Kontilai was at the time Hansel made his threats to deprive him of the criminal defense funds, punishable under the statute  NRS § 205.320 "Threats" (stated as: "*category B felony and shall be punished by imprisonment in the state prison for a minimum term of not less than 1 year and a maximum term of not more than 10 years, or by a fine of not more than $10,000, or by both fine and imprisonment. In addition to any other penalty, the court shall order the person to pay restitution*."

150.    The Court should enjoin Hansel's misconduct of blackmail, extortion, and threats, which are punishable under federal and State law, and thus prevent Hansel from attempting such illegal tactics and tools to get money immediately.

151.    The present claim for injunctive relief satisfies all four elements necessary for obtaining it: (1) irreparable injury in the absence of such an order; (2) Hansel impliedly threatened injury to the Plaintiff, which outweighs the harm to the opposing party resulting from the order; (3) that the injunction is not adverse to public interest, instead seeks to enforce the statutory loa; and (4) that the moving party has a substantial likelihood of success on the merits.

152.    Plaintiffs are entitled to an Order of this Court imposing injunctive relief concerning Hansel and his law firm.

**WHEREFORE**, Plaintiffs seek the following relief:

(A)     Damages on every Count allowing monetary damages;

(B)     Injunctive relief as asserted.

(C)     Punitive and/or exemplary damages against Defendants to the full extent allowed by the applicable law;

(H)     Such other and further relief as the Court finds and fair;

(I)     Attorney's fees and costs, whenever applicable.

**DEMAND FOR JURY TRIAL**.

Plaintiffs demand a jury trial on all claims being triable.

Dated: August 17, 2024

Respectfully submitted,

/signed George Lambert/
_____
GEORGE LAMBERT, Esq.,
DC bar #979327, Pro Se
THE LAMBERT LAW FIRM PROF. CORP.
1025 Connecticut Ave, # 1000 NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (800) 852 1950
Email: LawDC10@gmail.com
Attorney pro se and for The Lambert Law Firm
Professional Corporation

Exhibits A, B, C



**From:** Cary Hansel <Cary@hansellaw.com>
**Sent:** Thursday, July 11, 2024 8:54 AM

**Subject:** RE: Mykalai Kontilai Invoice 8



Mr. Kontilai has told me on multiple recorded calls since that he gave no such direction.

CARY J. HANSEL

HANSEL LAW, PC

2514 NORTH CHARLES STREET

BALTIMORE, MARYLAND 21218

DIRECT DIAL:  301-461-1040

FACSIMILE:    443-451-8606

Statement of Confidentiality:  The contents of this e-mail message and its attachments are intended solely for the addressee(s) hereof.  In addition, this e mail transmission may be confidential and it may be subject to legal privilege(s) protecting communications between attorneys and their clients or amongst attorneys and/or their staff.  If you are not the named addressee, or if this message has been addressed to you in error, you are directed not to read, disclose, reproduce, distribute, disseminate, or otherwise use this transmission and to please notify the sender immediately

Delivery of this message to any person other than the intended recipients is not intended in any way to waive privilege or confidentiality  If you have received this transmission in error, please alert the sender by reply e-mail; we also request that you immediately delete this message and its attachments, if any  Thank you



# HANSEL LAW, PC
## TRIAL AND APPELLATE COUNSEL

CARY J. HANSEL
Attorney at Law

2514 North Charles Street
Baltimore, Maryland 21218
www.hansellaw.com

Direct Dial: 301-461-1040
Facsimile:    443-451-8606
cary@hansellaw.com

August 6, 2024



████████████████████████████. Rather than risk our collection efforts <mark>interfering with future insurance payments,</mark> I would urge you to *please* reach out to us to negotiate a speedy and fair resolution beneficial to all.

Very truly yours,

HANSEL LAW, PC
/s/
Cary J. Hansel

cc:    David Feldman, Esquire
       George Lambert, Esquire
       Gavin Curley, Esquire



# HANSEL LAW, PC
## TRIAL AND APPELLATE COUNSEL

CARY J. HANSEL
Attorney at Law

2514 North Charles Street
Baltimore, Maryland 21218
www.hansellaw.com

Direct Dial: 301-461-1040
Facsimile:    443-451-8606
cary@hansellaw.com

August 8, 2024



 The insurers' refusal to honor our invoice without first requiring any substantive objection to anything therein while paying other bills for services more recently rendered (or to be rendered in the future) is an inducement to breach the legal services contract between Hansel

Law, PC and Mr. Kontilai. ████████████████████████████████████
████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████

     We respectfully demand payment of our outstanding invoice.  Failing that, we request that the insurers voluntarily agree to withhold and reserve the full amount of our outstanding invoice until such time as the question of payment is fully resolved.

     If we are unable to reach agreement on either point within the next 72 hours, we will seek judicial intervention, including injunctive relief to freeze any and all future policy payments until this issue is resolved and our invoice is paid in full.

████████████████████████████████████
████████████████████████████
████████████████████████████████████
████████████████ .

                   Very truly yours,

                     /S/

                 Cary J. Hansel

cc:    David Feldman, Esquire